☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 24-885M(NJ) |
| a BLU cell phone in a clear case, which was later inventoried as | ) |
| ATF Property Item #56387 / Case Item #3.  The cell phone was | ) |
| previously seized by the Oak Creek Police Department (OCPD) | ) |
| and is currently located at the ATF Milwaukee Field Office. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 7/11/2024_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.      xx☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 6/27/2024 @ 3:42 p.m.                *[signature: Nancy Joseph]*
                                                                                          *Judge's signature*

City and state:      Milwaukee, WI                     Honorable Nancy Joseph, U.S. Magistrate Judge
                                                                                      *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

The property to be searched is a cell phone previously seized by the Oak Creek Police Department (OCPD) during the arrest of Michael SALINAS pursuant to a Wisconsin State arrest warrant on June 11, 2024. The following cell phone was seized from SALINAS' person on June 11, 2024, and subsequently transferred to ATF on June 12, 2024:

      b. A BLU cell phone in a clear case which was later inventoried as ATF Property Item #56387 / Case Item #3.

The Device is currently located at the ATF Milwaukee Field Office.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

25

## ATTACHMENT B
## Particular Things to be Seized

1   All records and information on the Device described in Attachment A that relate to a violation of Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce) including:

      a.   Preparatory steps taken in furtherance of these crimes;

      b.   Any audio, video, and/or photograph(s) files on the phone of criminal activity or of evidentiary value;

      c.   All voicemail and call records;

      d.   All text messages;

      e.   All social media sites used and applications for social media sites;

      f.   All internet activity;

      g.   All location data including from the phone and/or from any downloaded applications;

      b.   Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

      c.   Records evidencing the use of the Internet Protocol address to communicate, including:

      a.   records of Internet Protocol addresses used;

      b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

Case 2:24-mj-00885-NJ    Filed 06/27/24    Page 5 of 33    Document 1

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 24-885M(NJ) |
| a BLU cell phone in a clear case, which was later inventoried as ATF Property Item #56387 / Case Item #3. The cell phone was previously seized by the Oak Creek Police Department (OCPD) and is currently located at the ATF Milwaukee Field Office. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 844(i) | use of fire to damage property affecting interstate commerce |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Digitally signed by RICKY HANKINS
DN: c=US, o=U.S. Government, ou=Dept of Justice, ou=ATF, cn=RICKY HANKINS, 0.9.2342.19200300.100.1.1=1500100169456
Date: 2024.06.26 11:50:31 -05'00'

Rick Hankins, Special Agent - ATF

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: 6/27/2024

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent of the U.S. Department of Justice's ATF, currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy. That training included various legal courses related to constitutional law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4.      In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises,

26

and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 305 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,690 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on multiple occasions for many agencies and institutions in several states. I have also participated in over 225 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5.    This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience.

6.    Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cell phones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that smart cell phones are capable of capturing location history for the device.

7.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce) have been committed by Michael SALINAS.  There is also probable cause to search

the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.    The property to be searched is a cell phone previously seized by the Oak Creek Police Department (OCPD) during the arrest of Michael SALINAS pursuant to a Wisconsin State arrest warrant on June 11, 2024.  The following cell phone was seized from SALINAS' person on June 11, 2024, and subsequently transferred to ATF on June 12, 2024:

      a.    A BLU cell phone in a clear case which was later inventoried as ATF Property
         Item #56387 / Case Item #3.

## PROBABLE CAUSE

9.    On May 7, 2024, the Milwaukee Police Department (MPD) responded to a fire scene at XXXX North 67th Street, Milwaukee, Wisconsin (MPD case #C24-05070161). The fire had been extinguished by an occupant of the building prior to the arrival of police.  The responding officer observed fire damage to the front door and its surrounding areas.  The officer also reportedly smelled an odor consistent with the presence of gasoline.

10.    XXXX North 67th Street was a two-unit rental apartment building with an upper unit and a lower unit.

11.    The tenant of the upper unit, C.E., was not home at the time of the fire and called police after they arrived home.  C.E. subsequently told MPD that they believed their ex-boyfriend, **Michael SALINAS** (W/M, DOB: XX/XX/1994) was responsible for setting the fire because SALINAS found out that C.E. had aborted a pregnancy for which SALINAS would have been the likely father.  C.E. identified their cell phone number as (414) 243-2847.

3

12.     C.E. initially told MPD that SALINAS had never lived at XXXX North 67ᵗʰ Street. However, in a later interview with ATF, C.E. admitted that SALINAS had lived at their apartment from approximately 4/02/2024 – 4/30/2024.  C.E. said they lied about SALINAS living at that location because SALINAS living there violated the rules related to their renter's assistance and they did not want to risk losing their renters assistance funding.

13.     During their interview by MPD, C.E. provided the following information:

14.     C.E. said SALINAS called them at 12:22PM on 5/07/2024 from a restricted number and stated, "…that's what you on" and C.E. hung-up.  C.E. stated SALINAS called them multiple times from <u>multiple restricted and unrestricted</u> phone numbers on May 7, 2024.  The unrestricted phone numbers that SALINAS used to call C.E. were (414) 368-0854 **[a Textnow number]**, (414) 316-0282 **[a Verizon number]**, (414) 307-8035  **[a Spectrum number]**, and (414) 567-8527 **[an AT&T number]**.

15.     On May 7, 2024, at 6:29PM, C.E. sent the following text to the (414) 307-8035 after SALINAS had used this number to call C.E.:

*"What kinda smoke yo op ass want Michael? My brother not about to play about me, so I can careless*

*what u thinking I'm scared of you a lil nigga that stay making rookie mistakes in your tracks baby we*

*not worried about u at all. U better chill tf out callin me like u the only mf bout that life what are u*

*mad about I don't bother u fool ass boy?!"*

(414) 307-8035 responded, *"You'll see"*

16.     C.E. also provided MPD video footage from their surveillance system that captured images of two white or light skinned males as they approached the front door of XXXX North 67ᵗʰ Street at approximately 9:29PM on May 7, 2024.  The two males each

4

carried a red container consistent with the appearance of gasoline containers. The video then captured sudden illumination and rapid fire at and near the front door at approximately 9:30PM. C.E. initially said they didn't believe the smaller male was SALINAS and didn't know who the other male might be. However, C.E. would later state to ATF that they reviewed the video again believed the smaller male in the video to be SALINAS.

17.     C.E. further told MPD that SALINAS set fire to his girlfriend's house who they identified as D.M. A query showed that D.M. was the victim of an arson fire at XXXX North 42nd Street, Milwaukee on February 2, 2024, at approximately 2:59AM (MPD case #C24-0330014).

18.     Regarding the fire on May 7th, MPD also recovered surveillance video from an elementary school located across the street from XXXX North 67th Street. The school's surveillance system captured images of the two arson suspects arriving in a black sedan at approximately 9:23PM that parked in an alley north of the fire location. The school's video system also captured one of the suspects lighting the fire at approximately 9:29:52PM, and then both suspects ran back to their vehicle in the alley.

19.     On May 9, 2024, Your Affiant went to XXXX North 67th Street and collected sections of carpet from inside the door and parts of the weather stripping attached under the front door. During the collection process, Your Affiant smelled a distinct odor consistent with the presence of a petroleum distillate.

20.     Also on May 9, 2024, ATF interviewed C.E. at XXXX North 67th Street. C.E. reiterated what they had told police and also said they believed one of the arsonists was their ex-boyfriend, Michael SALINAS. C.E. said they were not home when the fire

5

occurred but saw the damage when they arrived and smelled a strong odor of gasoline near the front door.

21.     C.E. volunteered that they had first-hand knowledge that SALINAS had set fire to D.M.'s home on 2/02/2024. C.E. said they and SALINAS were in bed together at C.E.'s home during the early morning hours of 2/02/2024 when SALINAS began asking to use C.E.'s vehicle so he could go damage D.M.'s house. C.E. said that SALINAS wanted to retaliate against D.M.'s son for damaging SALINAS' mother's house at XXXX North 46th Street on 1/31/2024. C.E. said SALINAS told them that his mother saw D.M.'s son break her front window on 1/31/2024. C.E. further stated that Michael SALINAS was furious about that incident because his children were allegedly at XXXX North 46th Street at that time and were showered with broken window glass. A query of Milwaukee Police Department (MPD) records showed that SALINAS' mom reported the broken window incident under MPD CAD #240310491.

22.     C.E. said they saw Michael SALINAS take cocaine and drink a lot of alcohol on 2/01/2024. As he consumed drugs and alcohol, C.E. stated SALINAS became more agitated about D.M's son breaking out the windows at XXXX North 46th Street. C.E. stated they told SALINAS that he had started it by SALINAS breaking out the windows of D.M.'s car days before 1/31/2024. C.E. said SALINAS admitted to them that he had broken out the windows of D.M.'s car. C.E. further said D.M. was an ex-girlfriend to SALINAS and the two of them regularly fought during that timeframe.

23.     While lying in bed during the early morning hours of 2/02/2024 with SALINAS at her residence, C.E. said they repeatedly refused his request to use their vehicle in his pursuit of revenge against the D.M family. C.E. stated that SALINAS kept

6

telling her that "Somebody's got to die. My kids were in there." C.E. further said they, at one point, got out of bed to take a shower and when they got out of the shower SALINAS was gone. C.E. said they then looked and saw that their 2008 silver Chevy Equinox (WI plate # XXX-4982) was also gone. C.E. stated they immediately began texting and calling SALINAS telling him to return their vehicle. C.E. showed ATF the text messages they sent to SALINAS on 2/02/2024 that were still on their cell phone. C.E. stated that SALINAS' cell phone number in February 2024 was (414) 629-2275, which is a T-Mobile number. The following is a summary of the text messages C.E. sent to SALINAS' cell phone number (414) 629-2275 on 2/02/2024:

24.     Beginning at 2:20AM, C.E. sent multiple text messages to SALINAS asking him to return their vehicle. C.E. informed SALINAS that they needed their vehicle and that it was their only form of transportation. SALINAS did not text back until after 11:00AM and made no mention of what he had done in those texts. C.E. then sent SALINAS a screenshot of a threating message they had received from (414) 797-5702 warning them that they better kick SALINAS out of their house because they knew he had been driving their vehicle during an arson. C.E. told ATF that they had sent themselves that threatening message in order to persuade SALINAS to move out of their house. C.E. said they created the fake text message via a cell phone application because they didn't want to be in the middle of the feud between SALINAS and the D.M family. C.E. said they were worried that the D.M. family would target their home for revenge if SALINAS continued to stay there. C.E. later said they ultimately told SALINAS that those threatening text messages were fake after it became clear that SALINAS was not going to move out.

25.     C.E. further said they called SALINAS multiple times during the early morning hours of 2/02/2024 after he took their Chevy Equinox.  C.E. stated that SALINAS answered one phone call and they could hear that he was pre-paying for gasoline at a gas station.  C.E. said they asked SALINAS where he was and SALINAS told them that he was at the Clark gas station near his mother's house (50th and Lisbon).  In that phone call, C.E. said SALINAS told them that he planned to use his key to D.M.'s house in order to pour gasoline inside and trap the D.M family.

26.     C.E. stated they called SALINAS again that morning asking him to return their vehicle and they heard SALINAS pouring a liquid.  In that phone call, C.E. said SALINAS told them that he had forgotten the keys to the D.M. house so he was pouring the gasoline at the front door.  While on the phone with SALINAS when SALINAS was at the D.M. home, C.E. said they overheard an unknown male ask SALINAS what was going on and SALINAS told the man that the man should call the police, which is consistent with a witness interviewed by MPD in which the witness stated they had confronted a Hispanic sounding man who the witness believed had set the fire.  C.E. said that SALINAS returned to their home after setting the fire at the D.M. house and SALINAS smelled like gasoline.  C.E. further stated that SALINAS was wearing a black hoodie, black pants, and black gloves when he came home.

27.     C.E. further said that SALINAS told them that he "fucked up" the fire at the D.M house and it wasn't successful.  C.E. stated that SALINAS said he "didn't do it right."  C.E. also said that SALINAS claimed his feud with D.M. wasn't over yet.  C.E. said SALINAS told them that a man confronted him when he started the fire and the man

8

asked what was going on, and SALINAS told him he didn't know but he should call the police.

28. C.E. stated that SALINAS told them that he had first gone to his mother's house to get a gas can for the D.M. arson and then went to the Clark gas station on 2/02/2024. C.E. said SALINAS brought the gas can with gasoline still in it back to their residence after the arson and stored it in the basement. C.E. stated the gas can was no longer at their house because a friend needed one at some point and took it.

29. C.E. said they recorded the phone call with SALINAS while he was setting fire at the D.M. home on 2/02/2024. C.E. further stated they recorded the call using their son's cell phone to record themself talking to SALINAS. C.E. attempted to find the recording on their son's cell phone but could not locate it for the agents. C.E. later provided their son's cell phone number as (414) 467-4807 with an iCloud account of mrlouisgonzalez2018@gmail.com.

30. The Milwaukee Police Department located a surveillance camera at MPD District 3 labeled "Courtyard" that faced north and captured images of the Clark gas station on 50th and Lisbon (4950 West Lisbon). Review of that video footage showed that a silver SUV consistent with a 2008 Chevy Equinox pulled into that gas station at approximately 2:26AM on 2/02/2024 and parked at a gas pump. The SUV exited the gas station at approximately 2:29AM. The SUV's front passenger headlight was not working. Your Affiant later asked C.E. via text if one of their headlights was out on her Chevy Equinox and they responded yes. A query of surveillance video at the Clark gas station showed that video footage was no longer available for 2/02/2024.

9

31.     C.E. said they learned on the weekend of 4/27/2024 that SALINAS had restarted a relationship with D.M. so they were fed up with SALINAS.  C.E. said by 4/30/2024, they made it clear to SALINAS that they didn't want to be with him and he moved out.

32.     C.E. stated they created a fake Facebook account under the profile name "MichaelDownLow" and contacted Michael SALINAS via Facebook from the fake account on 5/07/2024.  C.E. showed ATF their contact with Michael SALINAS' Facebook account "Michael Salinas" [Facebook ID #10003425030979].  The Facebook records on C.E.' cell phone showed they began sending messages to SALINAS' account at 12:14PM on 5/07/2024 but SALINAS did not respond.  The records also showed that C.E. attempted to call SALINAS via Facebook at 5:15PM.  C.E. said they created the fake Facebook page in order to goat and irritate SALINAS because they recently learned he was staying with D.M. again.  The messages C.E. sent to SALINAS via the fake Facebook page were now deleted from their cell phone but they stated that the first message they sent to SALINAS at 12:14PM on 5/07/2024 asked SALINAS if D.M. knew SALINAS was responsible for the murder of D.M's nephew.  Shortly after they sent that Facebook message, C.E. said SALINAS called their cell phone and stated, "That's what your on."  C.E. said she played dumb and pretended to not to know what SALINAS was talking about and insisted it was not them sending him Facebook messages, but he didn't believe them.

33.     The following is a summary of information C.E. provided regarding the murder of D.M.'s nephew:

34.     When asked to explain why they think that SALINAS was responsible for the murder of D.M.'s nephew, C.E. stated that SALINAS told them he was very angry at

10

D.M.'s nephew because the nephew had put a gun to SALINAS' face and D.M. had to grab the gun from her nephew. C.E. said SALINAS told them that SALINAS had one of his guys respond to D.M.'s house and that guy watched the nephew leave and he followed the nephew home to learn where the nephew lived. C.E. further said the nephew was killed 1-2 days later. C.E. stated that SALINAS admitted he had asked someone to take out D.M.'s nephew.

35.    C.E. said SALINAS called them sometime on 1/03/2024 and asked them to pick him up because D.M. had called the cops on him and the cops were looking for him because he had pushed D.M. down and chased her with a knife. (MPD records showed that D.M. called police on 1/01/2024 to report that SALINAS had stolen her vehicle that he was passed out in that vehicle. SALINAS was present when she called the police – MPD case #C24-0010178) When C.E. picked SALINAS up on 1/03/2024, C.E. said SALINAS had them drive by a candle memorial near 37th Street and St. Paul Avenue in Milwaukee and SALINAS said, "Yeah, that nigga dead." C.E. said SALINAS kept looking up online news articles related to the murder of D.M.'s nephew. C.E. said that SALINAS claimed he wanted to get away from D.M. in case she knew he was responsible for the murder. C.E. said they and SALINAS met up with SALINAS' brother, Arnold LNU (Last Name Unknown), at Landmark in Milwaukee later on 1/03/2024. C.E. stated they were present when SALINAS told Arnold that "the guy" was dead and that SALINAS was the one who "got his ass gone." C.E. said Arnold had a different last name than SALINAS.

36.    C.E. later texted Your Affiant a link to a news article that identified D.M.'s murdered nephew as A.M. (DOB: XX/XX/1992). A query of MPD homicide records

11

showed that A.M. and a female were shot to death inside XXX North 37th Street at approximately 12:45PM on December 21, 2023 (MPD case #23-3550061) – approximately one block from 37th and St. Paul.

37.     Agents asked C.E. if one of their arsonists was SALINAS as they claimed, who would be the other arsonist.  C.E. said the other arsonist was much bigger than the one they believed was SALINAS and the only person that size that SALINAS hangs out with is his brother Arnold.  C.E. described Arnold LNU as very large and light skinned. C.E. located a Facebook page for Arnold with the username "Zen Kahn" [Facebook ID #100001064461133].

38.     C.E. further stated that they talked to D.M. on 5/08/2024, and informed D.M. that SALINAS was responsible for her nephew's murder.  C.E. said that D.M. appeared to believe them based on the details that C.E. had regarding the firearm incident with the nephew and knowledge of the murder location.

39.     C.E. texted Your Affiant on 5/10/2024 and provided images of SALINAS' brother Arnold.  C.E. further said Arnold lived in the upper unit at XXXX West Lisbon and Arnold's cell phone number is (414) 788-5776.    Your Affiant located a second Facebook account for SALINAS' brother Arnold under the username "Maxter Howard (Zen Khan)" and C.E. confirmed that the person in the available profile photograph was the brother of Michael SALINAS.  Furthermore, "Maxter Howard" was Facebook friends with Michael SALINAS.  Based on birthday messages posted on Maxter Howards' publicly available Facebook page it showed he turned 31 on XX/XX/2021, which made his birthdate XX/XX/1990.  A records query showed that an Arnold L. Howard (DOB: XX/XX/1990) was associated with cell phone number (414) 788-5776.  Arnold Howard's

12

Wisconsin DL listed address is XXX North 71st Street, Milwaukee. When asked what vehicle Arnold Howard was known to drive, C.E. located the car they knew Arnold Howard drove and sent an image to Your Affiant that depicted a black Honda 4-door hatchback sedan with WI plate #XXX-7426 that was parked in front of XXXX North 71st Street on 5/10/2024, which is an address known to C.E. as the home of SALINAS' sister.

40. MPD queried license plate #XXX-7426 in the Milwaukee Flock surveillance system and found that same vehicle had been captured on camera traveling northwest on West Fond du Lac Avenue at the intersection of West Capitol Drive in Milwaukee at approximately 9:16PM on 5/07/2024, which is toward the general direction of 5745 North 67th Street. According to Google maps, the approximate travel time from the intersection of West Fond du Lac Avenue and West Capitol Drive to 5745 North 67th Street is approximately 7 minutes. The surveillance cameras at the elementary school showed that the arson suspects' dark colored sedan arrived in the alley north of 5745 North 67th Street at approximately 9:23PM on 5/07/2024. C.E. later informed Your Affiant that they had called Arnold Howard on 5/07/2024 after the fire and told Howard that what SALINAS would not get away with setting the fire and also told Howard that C.E. was sending the police to Howard's house. C.E. said they called Howard from phone number (414) 393-8104, which was SALINAS' number that C.E. had bought for SALINAS but had reclaimed after SALINAS' moved out. C.E. also said Howard sent C.E. a Facebook message on 5/14/2024, which were provided to ATF. Arnold Howard sent the messages via his Facebook profile "Zen Khan" [Facebook ID #100001064461133]. Howard asked C.E. not to send cops to his house anymore. Howard told C.E. that he understood his brother was on "bullshit" but that wasn't Howard. Howard further told C.E., "…We been

13

cool the whole time so I'm just tryna keep shit drama free with us!" C.E. then sent Howard screenshots from the surveillance video that showed the two arsonists setting fire to the apartment building on 5/07/2024, and told Howard that whoever set the fire with SALINAS was "dumb" because they were caught on camera. Howard responded, "I'm sayin something now cuz I wanted to let shit cool off. Like I said, I'm just trying to keep shit smooth, but I didnt like gettin put in some shit that ain't have nothin to do with me. I'm too old for the extra shit."

41.     On June 11, 2024, ATF interviewed D.M. at her residence of 2150 North 42nd Street, Milwaukee, WI. Agents informed D.M. they were assisting the investigation regarding the fire that damaged her home on February 2, 2024. Agent Hankins asked D.M. to recap what she knew about the fire that occurred on February 2, 2024, and D.M. stated she was in the shower when the fire occurred. D.M. later said she is a bus driver for the City of Milwaukee and wakes up at 2:00AM to get ready for work. D.M. further said she noticed flashing lights outside her home when she got out of the shower and discovered firefighters on her front porch putting out the fire. D.M. also said he smelled an odor of gasoline.

42.     Your Affiant then asked D.M. what was going on in her life leading up to the fire. D.M. stated that a man who she had dated (that she later identified as Michael SALINAS) had stolen her truck while she was asleep and crashed the truck. D.M. learned that SALINAS had taken her truck when her son woke her up while the son was on the phone with SALINAS through the Facebook messenger application. D.M. heard SALINAS say he had taken her truck and SALINAS sounded drunk. D.M. said her daughter then drove D.M. to look for her vehicle on North Avenue and they located her

14

vehicle at a tobacco shop where it was disabled. D.M. further said she needed to have her truck towed. D.M. also said she found SALINAS passed out in the truck's backseat. As she opened the door to her vehicle, D.M. said her cell phone connected to her vehicle's infotainment system while she was on the phone with 911. D.M. said her phone call to 911 broadcasted on her truck's speaker system which woke up SALINAS in the backseat, at which point SALINAS ran from the scene. D.M. further said her damaged truck sat unrepaired for a while because she had to come up with money to help pay for the funeral of her murdered nephew. After she finally got her truck fixed, D.M. said she later found her vehicle windows busted out while it was parked at her house.

43.     D.M. stated she believed that SALINAS had used C.E.'s vehicle when he set D.M.'s house on fire. D.M. said her neighbor reported that they witnessed the arson and saw the arsonist drive a silver truck. D.M. further said SALINAS' girlfriend at that time, C.E., owned a silver Chevy Equinox. D.M. also stated that C.E. had previously driven SALINAS in that Chevy Equinox when SALINAS stalked and harassed D.M.. D.M. also alleged that C.E. had helped SALINAS make copies of house keys for D.M.'s home. D.M. stated that C.E. later told her that SALINAS stole C.E.'s vehicle to commit the arson and that C.E. was on the phone with SALINAS as he was setting fire to D.M.'s house.

44.     Your Affiant asked D.M. if SALINAS ever claimed responsibility for setting the fire at her house, and D.M. said SALINAS denied doing it. D.M. stated that SALINAS had admitted to her that he had set a house on fire when he was younger.

45.     ATF informed D.M. that phone records showed SALINAS called D.M. on the night of C.E.'s fire around 8:33PM. Your Affiant asked D.M. about SALINAS'

15

mindset and what was said. D.M. stated that SALINAS was mad at C.E. because C.E. had created a fake Facebook page and posted SALINAS' "business", such as SALINAS being an alcoholic and having liver cancer. D.M. further said that SALINAS was also upset that C.E. had posted the home address of SALINAS' mother.

46. D.M. said she told SALINAS not to do anything stupid in retaliation to C.E.'s online posts, because SALINAS can be unpredictable when he drinks. D.M. stated that D.M. claimed he wasn't going to do anything. D.M. further stated she tried to tell SALINAS to let the Facebook taunts go but that there's "no talking" to SALINAS when he's drunk and he was still mad. When asked, D.M. said SALINAS tried calling her later that same night but her cell phone was on do-not-disturb because she needed to get up early for work.

47. D.M. said her nephew and his girlfriend were murdered on 37th Street on 12/21/2023. D.M. further said a lot of things happened around that same time, such as her vehicle being stolen by SALINAS and her windows being broken.

48. Your Affiant asked D.M. if her nephew ever had issues with SALINAS and she said yes. D.M. stated that her nephew didn't like SALINAS' behavior when SALINAS was drunk. D.M. further said she and SALINAS had been in physical altercations and her nephew didn't like SALINAS as a result of that. When asked if there had been a specific incident between her nephew and SALINAS, D.M. said her nephew had pulled a gun on SALINAS one day before her nephew was murdered. D.M. said her nephew showed up at her house around 1:00AM and SALINAS followed her to the front door when she answered it. D.M. stated that her nephew got an evil look on his face when he saw SALINAS and then pulled out a gun and said, "I should blow your bitch-ass away

16

right now…you fucked with the wrong auntie." D.M. said she told her nephew to chill out. D.M. said she was her nephew's favorite aunt. D.M. further stated that her nephew never witnessed SALINAS' mistreatment of D.M. but word of the mistreatment spread around the family. D.M. said that SALINAS had punched her and split her lip and she believes that incident is what upset her nephew. When asked how SALINAS responded to having her nephew point a gun at him, D.M. said SALINAS didn't show a reaction. D.M. said she ended up talking to her nephew that night about what he wanted to do with his life and her nephew wanted to start selling cars. D.M. also said her nephew told her that night that he had moved into a new place but she didn't know where that was until after he was murdered the next day.

49.     On June 11, 2024, at approximately 6:54PM, Your Affiant received a phone call from D.M. who stated that her daughter had just observed Michael SALINAS driving C.E.'s truck with C.E. as the front passenger. According to D.M., her daughter also overheard that SALINAS and C.E. were staying at the Red Roof Inn on South 13th Street (in Oak Creek, WI).

50.     Your Affiant sent a series of text messages to C.E., (414) 243-2847, beginning at 6:57PM on June 11, 2024. Your Affiant asked if C.E. was safe and if she was with SALINAS. C.E. responded and stated she was safe and not with SALINAS. C.E. also denied that SALINAS had been driving her vehicle.

51.     Your Affiant subsequently notified the Milwaukee Police Department Fusion Center that Michael SALINAS, who had an open felony warrant, was potentially at the Red Roof Inn. On this same date, the Oak Creek Police Department later observed SALINAS exit the hotel with C.E. and arrested SALINAS, who had a cell phone on his

17

person.  C.E. sent Your Affiant a text message at 9:30PM on June 11, 2024, which stated, "They got him."

52.     C.E. called Your Affiant at 9:31PM and apologized for lying to Agent Hankins about being with SALINAS.  C.E. further stated that SALINAS had called C.E. on June 10, 2024, and asked to see her.  C.E. said SALINAS apologized to her for setting her apartment on fire and he sounded sincere, so she agreed to meet him.  C.E. further stated she and SALINAS had stopped by his mom's house on June 11, 2024, before they returned to their hotel room at the Red Roof Inn that she had rented.

53.     On June 12, 2024, ATF took custody of a BLU cell phone in a clear case that had been possessed by Michael SALINAS at the time of his arrest by the Oak Creek Police Department on June 11, 2024, for an open felony warrant.  The BLU cell phone was listed and located in SALINAS' inmate property when he was booked into the Milwaukee County Jail.  Milwaukee County Sheriff's Office Detective Todd Rosenstein retrieved the cell phone from SALINAS' inmate property and delivered the cell phone to Agent Hankins on June 12, 2024.  Agent Hankins inventoried the cell phone as ATF Property Item #56387 / Case Item #3.

54.     On June 12, 2024, ATF conducted a custodial interview of Michael SALINAS at the Milwaukee County Jail located at 949 North 9th Street, Milwaukee, WI. SALINAS was placed in a secure interview room.  The following is a summary of the custodial interview of SALINAS on June 12, 2024:

55.     Agents identified themselves to SALINAS and Agent Hankins subsequently provided SALINAS the Miranda Warning.  When asked where he lived,

18

SALINAS said he was "floating" around. SALINAS stated he recently got a new cell phone and did not know his phone number.

56. Agent Hankins informed SALINAS that ATF got involved in an arson investigation to determine if the crime violated federal statutes. Agent Hankins further told SALINAS that surveillance video showed two individuals and that SALINAS was one of them. Agent Hankins also told SALINAS that investigators wanted to determine the motive behind the arson. SALINAS asked if he was being charged with a crime. Agent Hankins told SALINAS that he was not facing charges now but could be depending on the circumstances related to the fire set on North 67th Street. Agent Hankins asked SALINAS about his mindset on the night of the fire. SALINAS claimed he didn't do anything.

## TECHNICAL TERMS

57. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text

19

messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna

20

receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

58. Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera and video recorder, portable media player, internet web browser, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

21

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

60.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

> a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

22

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

61.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23

62. *Manner of execution.* Because this warrant seeks only permission to examine the Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Case 2:24-mj-00885-NJ    Filed 06/27/24    Page 30 of 33    Document 1

**ATTACHMENT A**
**Property to Be Searched**

The property to be searched is a cell phone previously seized by the Oak Creek Police Department (OCPD) during the arrest of Michael SALINAS pursuant to a Wisconsin State arrest warrant on June 11, 2024. The following cell phone was seized from SALINAS' person on June 11, 2024, and subsequently transferred to ATF on June 12, 2024:

      b.  A BLU cell phone in a clear case which was later inventoried as ATF Property Item #56387 / Case Item #3.

The Device is currently located at the ATF Milwaukee Field Office.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**
**Particular Things to be Seized**

1    All records and information on the Device described in Attachment A that relate to a violation of Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce) including:

      a.   Preparatory steps taken in furtherance of these crimes;

      b.   Any audio, video, and/or photograph(s) files on the phone of criminal activity or of evidentiary value;

      c.   All voicemail and call records;

      d.   All text messages;

      e.   All social media sites used and applications for social media sites;

      f.   All internet activity;

      g.   All location data including from the phone and/or from any downloaded applications;

      b.   Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

      c.   Records evidencing the use of the Internet Protocol address to communicate, including:

      a.   records of Internet Protocol addresses used;

      b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

26

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.